Syllabus.

## WILLIAM HALL et al.

### v.

## THE FIRST NATIONAL BANK OF EMPORIA.

*Filed at Ottawa May 14, 1890.*

1. CONSTRUCTION OF CONTRACT—*as viewed by the parties—attendant circumstances—subject matter, etc.* The construction which the parties put upon their contract, if not inconsistent with its terms, will be adopted in its interpretation by the courts.

2. In order to ascertain what parties intend by the use of language employed, it is frequently quite important to consider the subject matter to which it relates, the position of the parties, and the objects they may have sought to attain. The contract may be viewed in the light in which the parties viewed it, and as nearly as practicable from their standpoint.

3. Stock brokers at the Chicago Union Stock Yards telegraphed to a banker: "We will honor G. & W.'s draft for cost of cattle and hogs consigned to us." Quite a number of such drafts were honored, but acceptance of the last draft drawn and discounted was refused: *Held,* that for the purpose of showing whether the promise of the brokers was for one draft, only, or for all such drafts as might be drawn, the jury had the right to consider the arrangement or contract between G. & W. and the brokers, for the shipping to the latter of live stock, and all the facts and circumstances proven, and the construction the parties themselves put upon their contract.

4. BILL OF EXCHANGE—*promise of acceptance—upon consignment of property—consignment not completed.* If one agrees to accept a draft before it is drawn, for the cost of cattle, and the cattle are consigned to him, he will be liable on the draft as fully as if he had formally accepted the same upon its presentation.

5. Where a party agrees beforehand that he will accept a draft to be drawn on him for cost of cattle consigned to him, he will be liable to a *bona fide* holder of the draft, although the cattle for which it was drawn never reached the consignee, and an inferior lot is by mistake shipped to him.

6. And where the party agrees to accept and pay a draft for cattle bought and consigned to him, without requiring a bill of lading to be attached, he, and not the party who in good faith advances money on the draft, relying on such promise to accept and pay, takes the risk of the stock being diverted while in transit, either by accident or design.

7. SAME — *accepting consignment — as an acceptance of draft.* If a broker takes a consignment of a lot of cattle with the knowledge that a draft has been drawn on him for the same by the consignor, he can not retain the cattle, or proceeds, and repudiate the draft, but must pay it.

8. SAME—*bona fide holder—presumption.* The holder of a draft will, in the absence of any evidence tending to show the contrary, be presumed to be a *bona fide* holder for value.

9. SETTING ASIDE DEFAULT—*discretionary.* A motion to set aside a judgment rendered on default is addressed to the sound legal discretion of the court, and ordinarily the refusal to grant the same can not be assigned for error.

10. PRACTICE—*directing what the verdict shall be.* Where there is evidence tending to prove the issues, there will be no error in the court refusing to take the case from the jury.

11. VERDICT—*requisites—finding issues, without assessing damages.* After judgment by default in assumpsit, and the assessment of the damages by the court, on defendant's motion, the judgment was stayed, and he was allowed to plead, and a trial was had on the issues thus made. The jury, by their verdict, simply found the issues for the plaintiff, making no assessment of damages: *Held,* that the verdict was not erroneous, in either form or substance.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. JOHN P. ALTGELD, Judge, presiding.

This is a suit by the First National Bank of Emporia, doing business at Emporia, Kansas, against William and Simeon F. Hall, partners, etc., to recover upon the alleged promise by the Halls to accept and pay drafts drawn on them by Greer & Way, and which had been discounted by the bank. There was evidence that Greer & Way, who were cattle dealers and shippers in Kansas, made arrangements with appellants, who were cattle brokers at the Union Stock Yards at Chicago, by which the latter were to sell the stock shipped them by the former, and were in some way to divide profits or commissions with Greer & Way. Contemplating shipments, Greer & Way, on August 10, 1886, wrote to appellants:

"Please write the First National Bank of Emporia that you will pay our draft for any fat cattle we buy. I expect we will ship five or six loads of cattle the first of next week. * * * We think we will get a good many cattle from here. The cattlemen do not like present prices, but the cattle will have to go soon.        Respectfully,        GREER & WAY."

On the receipt of this letter, appellants telegraphed appellee as follows:

"UNION STOCK YARDS, ILL., 8,/13, 1886.

"We will honor Greer & Way's draft for cost of cattle and hogs consigned to us.        HALL BROS. & CO."

Greer testified, that he made an exact copy of the telegram of the appellants to his firm, the original having been destroyed, which reads: "Have wired First National Bank we will honor your drafts."

Between the date of the telegram and the drawing of the draft in suit, Greer & Way drew seven drafts on appellants, upon which appellee advanced the money, and they were all paid, and accepted by appellants. The evidence tended to show that three of these drafts on their face had the words, "Drawn on tel.—8,/13;" and the draft in suit was drawn in the same way, and appellee advanced money to Greer & Way thereon to pay for cattle consigned to appellants. On September 13 and 15, drafts to the amount of $9500 were drawn against stock shipped which sold for only $8139.16, which, it is claimed, were drafts in excess of the cost of the cattle. On September 29 Greer & Way made a draft for $6350 for a bunch of cattle known as the "Thrawl cattle," which is also claimed to have been overdrawn, the cattle realizing only $5259.15. Appellants having paid these drafts, Greer & Way were liable to them in the sum of $3300 on that account. On September 30 and October 1, two drafts, one for $10,800 and the other for $6200, came to appellants, together with sixteen car-loads of cattle, which Mr. Greer accompanied. The first was ac-

cepted and paid, but the $6200 draft was held over until the Halls were assured by Greer, October 1, that his firm was to ship ten car-loads of cattle that night. Hall then paid the draft, and sent Greer to New York with the sixteen cars of cattle. When this draft was paid, appellants had no notice that a draft had been drawn against the cattle then in transit, but on October 4 received notice of the draft in suit, dated October 2, 1886, and calling for $4639.97.

It appears that Greer & Way were also shipping cattle to Kansas City, of a different grade, and for some reasons—it is claimed to have been by mistake—the cattle intended by Greer & Way to be shipped to appellants, were sent to and sold at Kansas City, while those intended for Kansas City came through, and were received and sold by appellants, realizing $5213.35, being $424.97 more than the draft drawn against them. Appellants did not receive the identical cattle that were shipped to them, and this becoming known October 5, appellants refused to pay the draft. There is no evidence that the bank in any way controlled the shipment of the stock, or had or attempted to exercise any authority in that respect. Judgment by default was rendered against appellants for $4736. Afterwards, on motion to set aside the default, and for leave to defendants to plead, further proceedings on the judgment were stayed, and appellants allowed to plead, leaving the judgment to stand until a trial was had on the issue joined on such pleas. A trial on the merits, by jury, resulted in finding the issues for the plaintiff below. Motion for a new trial was overruled, and the court thereupon ordered that the original judgment stand in full force as of the date of its rendition. The judgment was affirmed in the Appellate Court, and the defendants below prosecute this appeal.

Mr. E. F. MASTERSON, for the appellants:

The court, by its ruling on the evidence and instructions, took from the jury the consideration of the questions of fact.

There was error in the improper conduct and remarks of the court in the presence of the jury, having a tendency to prejudice appellants' defense.    Thompson on Trials, secs. 2421, 206, 218, 219.

Defendants' objections to the recital of all conversations between either Greer or Way and Griffith should have been sustained.    All the evidence as to the acceptance of other drafts was improperly admitted.    The proof of acceptance should have been confined to the one in suit.

The court erred in overruling appellants' motion to dismiss, for the reason the plaintiff had not made a *prima facie* case.

All the drafts subsequent to the first one were accepted "after making," up to the last, which was not accepted, as there were no cattle to meet it, which refusal was right.    *Bank* v. *McFarland*, 3 Denio, 553.

The doctrine in *Bank* v. *Diefendorf*, 90 Ill. 396, that a promise by a party to pay a draft before it is sent, is equivalent to an acceptance as to the payee, who has advanced money on it, does not apply to this case, for two reasons,— first, these defendants never promised to accept this identical draft; and second, the payee never advanced one cent upon the draft in question.

The court erred in the giving and refusing of instructions, and the verdict of the jury is erroneous in failing to find the plaintiffs' damages.

Messrs. PECKHAM & BROWN, for the appellee:

The motion to set aside the judgment by default was addressed to the discretion of the trial court.    *Bowman* v. *Wood*, 41 Ill. 203; *Thielman* v. *Burg*, 73 id. 293.

The construction which the parties themselves, by their acts, have placed upon a contract, is a legitimate, and ordinarily a conclusive, guide to the courts in construing it.    *Chicago* v. *Sheldon*, 9 Wall. 50; *Vermont Street M. E. Church* v. *Brose*, 104 Ill. 206.

No exception was taken to any of the remarks of the court here complained of.    The complaints are very trivial.

Mr. CHIEF JUSTICE SHOPE delivered the opinion of the Court:

This suit was upon a draft drawn by Greer & Way, October 2, 1886, in favor of appellee, upon the defendants, which, it is alleged, they undertook and promised the plaintiff to accept and pay.    We shall consider only such points as are material, not observing the order in which they are made.    The principal question is, whether the defendants agreed to accept and pay the draft in suit.    That is a question of fact, but upon its determination depends the propriety of some of the instructions, and we are therefore at liberty to consider the evidence.    The contention of appellants is, that they did not agree with appellee to accept more than one draft, which they did accept and pay, and hence there was no liability upon their non-acceptance of the draft in suit.    For this reason, also, they contend that the court erred in not dismissing the suit.

At the request of the drawers of the bill, the defendants telegraphed to appellee, August 13, 1886, as follows:    "We will honor Greer & Way's draft for cost of cattle and hogs consigned to us."    This language, standing alone, without reference to the facts, might justify the contention of appellants, and the acceptance of the first draft, on August 23, 1886, might be held a performance of the promise to accept and pay. But when viewed in the light of other facts connected with the transaction, both before and after the sending of the telegram, it must, in our judgment, be given a different construction. Some arrangement had been made—what, is not important,— between the defendants and Greer & Way, by which the latter were to buy and ship cattle and hogs to the former, at the Union Stock Yards, to sell, and it was agreed that the commission on all sales made of stock shipped by Greer & Way should be divided between defendants and said firm,—thus

clearly indicating that not one, but various, consignments were to be made. This understanding is further indicated by the letter written by Greer & Way to the defendants, in which the latter are asked to write to the bank "that you will pay our draft for *any* fat cattle we buy. I expect we will ship five or six loads of cattle the first of next week. We think we will get you a good many cattle from here." The request was not to inform the bank they would pay a single draft, but would pay their draft for *any* fat cattle they might thereafter buy. This, and the statement that they expected to get the defendants a good many cattle, and that they expected to ship five or six loads of cattle the first of the week following, does not indicate that a single shipment was in the contemplation of the parties. It was in answer to this letter that the telegram was sent. So, also, several of the drafts drawn by Greer & Way, discounted by appellee, and accepted by appellants, had written on their face, "Drawn on tel.—8,/14," which unquestionably referred to the telegram in question. The parties, by their conduct, have placed a construction on the words used in the telegram, that it referred, and was intended to apply, not to a single draft, but to all such drafts as might be drawn by Greer & Way upon cattle shipped to appellants by them, and from the course of dealing, appellee was justified in so understanding and treating it, until notified to the contrary. The construction which parties put upon their contract will, if not inconsistent with its terms, be adopted, in its interpretation, by the courts. *Vermont Street M. E. Church* v. *Brose*, 104 Ill. 206.

Evidence of the attending facts and circumstances was competent, as tending to illustrate that the promise was not intended to be confined to a single transaction. We think there was no error in the refusal of the court to take the case from the jury. This can not be done where there is evidence tending to prove the issue. It was for the jury to say whether or

not the defendants promised to accept the particular draft in question. In respect thereof the court instructed the jury:

"In determining whether or not the defendants agreed to honor only one draft, or whether they agreed to honor any draft, drawn by Greer & Way, in favor of the plaintiff herein, for the cost of cattle consigned to the defendants, you will consider the arrangement and character of the business between the defendants and Greer & Way, and all the facts and circumstances proven in the case."

The objection made to this instruction is, that the jury has nothing to do with the arrangement and character of the business between the defendants and Greer & Way, and it is insisted that the only evidence proper for the consideration of the jury was the telegram, alone. This can not be so. In order to ascertain what parties intend by the use of the language employed, it is frequently of the first importance to consider the subject matter to which it relates, the position of the parties, and the objects they sought to attain. The contract must be viewed in the light in which the parties viewed it, and, as near as practicable, from their standpoint. The evidence was proper for the consideration of the jury, and the instruction is not obnoxious to the objection that it gives undue prominence to some of the facts, to the exclusion of others.

The first instruction given by the court is also objected to, as assuming that the bank was a *bona fide* holder of the draft for value, and that cattle were consigned to the defendants therefor. It is not subject to the criticism. It reads:

"If you believe, from the evidence, that the defendants agreed to honor the drafts of Greer & Way for the cost of cattle consigned to the defendants, and that the draft herein sued on was drawn for the cost of cattle, in pursuance of said agreement, and that said cattle were consigned to the defendants, then you will find the issues in this case for the plaintiff."

It can not be fairly said that the instruction assumes any fact. If the defendants agreed to accept the draft before it

16—133 ILL.

was drawn, for the cost of the cattle, and it was so drawn, and the cattle were consigned to the defendants, they would be liable therefor as fully as though they had formally accepted the draft upon its presentation. Nor can the contention that the cattle for which the draft was drawn never reached defendants, but that an inferior lot was shipped to them, avail, as against the plaintiff, in this case. If it be true, as it probably is, that the cattle against which the draft was drawn ultimately were sold at Kansas City, the bank knew nothing of the diversion of the consignment, and the substitution of other cattle in their place or stead, and can not be affected thereby, whether the diversion was accidental or by design. As said by the Appellate Court: "Where a party agrees to accept and pay a draft for cattle bought and consigned to him, without requiring a bill of lading to be attached, he, and not the party who, in good faith, advances money on the draft, relying on such promise to accept and pay, takes the risk of the stock being diverted while in transit, either by accident or design." It is apparent, also, that appellants suffered no injury in respect of this particular shipment, as the cattle realized a sum in excess of the draft.

It is also objected that the court erred in giving the second instruction, which is as follows:

"Or if you find, from the evidence, that the defendants agreed to accept only one draft, and no more, then you are instructed, that if you find, from the evidence, that the draft sued on was given for the cost of cattle which were consigned to the defendants, and that the defendants were notified of said draft by the holders thereof, and were asked to pay the same before receiving the cattle against which they were told it was drawn, and that thereafter the defendants received and sold the cattle against which they understood said draft was drawn, and received the proceeds of said cattle, then you will find the issues in this case for the plaintiff."

If the defendants took the consignment of the cattle with the knowledge that a draft had been drawn against the same by the consignors, they could not thereafter retain the cattle, or their proceeds, and repudiate the draft. (1 Parsons on Bills, 291; *Nutting* v. *Sloan,* 57 Ga. 397.) We think the instruction states the law with substantial accuracy, and that it is not open to objection.

It is also contended that plaintiff could not recover without proving that it was a *bona fide* holder of the draft. Without looking into the evidence on this point, the rule at law is, as we understand it, that the holder of a draft will, in the absence of any evidence tending to show the contrary, be presumed to be a *bona fide* holder for value. (1 Parsons on Contracts, *249.) The evidence does not tend to rebut this presumption, but, we think, clearly shows facts and circumstances from which the jury would be justified in finding that the bank paid the amount of the draft to the drawers, relying upon the promise of the defendant to pay the same.

No good purpose could be served by noticing in detail the instructions given or refused by the court, further than we have already done. Those given covered every material matter proper to go to the jury in those refused.

Various objections are made to the conduct of the trial judge. It is enough to say that no exceptions appear to have been taken in respect of such conduct. If the trial judge was guilty of impropriety,—which, however, we are unable to find in this record,—the party objecting must, by objection and exception, properly preserve the same in the record, if he desires to insist upon the same upon error or appeal.

The objections here made are very numerous, but we shall particularly notice only one other,—that in respect of the verdict of the jury. The form of the verdict was: "We, the jury, find the issue for the plaintiff,"—no damages being assessed by them. The reason for this appears to be that the defendants had suffered judgment to go against them by default, and

the court thereupon assessed the damages and rendered final judgment. On a motion by the defendants to set aside the default and for leave to plead, that court stayed proceedings on the judgment, and allowed the defendants to plead, but refused to set aside the judgment, allowing it to stand as a security for the plaintiff until the trial of the issue presented by the pleas. If the defendants failed to establish their defense, judgment was to stand. Under such circumstances, the verdict of the jury was not erroneous in form or substance, as the question of damages was not submitted to them. A motion to set aside a judgment rendered on default is addressed to the sound legal discretion of the court, and ordinarily the refusal to grant the same can not be assigned for error. Here the defendants availed themselves, as they might, under the leave of the court, to plead to the merits. Having done so, and the issue submitted to the jury having been found adversely to them, they can not complain, under the circumstances here shown.

We have carefully considered the very numerous points made by counsel, and failed to find in any of them such error as would justify a reversal of the judgment. We are satisfied, from the whole record, that substantial justice has been done, and the judgment of the Appellate Court must be affirmed.

*Judgment affirmed.*