## JAMES RIVER NATIONAL BANK v. FRANK THUET AND ANOTHER.[1]

December 1, 1916.

Nos. 19,955—(95).

**Bills and notes — acceptance of draft — construction of telegram.**

> Defendants telegraphed plaintiff bank: "We will honor draft of G. Roedel bill of lading attached for stock purchased by him shipped Thuet Brothers." In the light of the surrounding circumstances, the relations of the parties, and their conduct, this telegram is *held* to be an acceptance by defendants of all drafts drawn on them by the person named, with bill of lading attached to pay for stock shipped to defendants by him during the current season, and not merely an acceptance of only the first draft drawn.

Action in the district court for Ramsey county against the members of the firm of Thuet Brothers to recover a balance of $1,475.89. The facts are stated in the opinion. The case was tried before Olin B. Lewis, J., who made findings and ordered judgment in favor of plaintiff for the amount demanded. From the judgment entered pursuant to the order for judgment, defendants appealed. Affirmed.

*O'Brien, Young & Stone,* for appellants.

*Edward P. Sanborn,* for respondent.

BUNN, J.

Plaintiff sought to recover in this action the amount of a draft, less

[1]Reported in 159 N. W. 1093.

a credit, drawn on defendants by one G. Roedel, and paid by plaintiff. The ground upon which defendants' liability is predicated is that they accepted the draft in writing. The court so found, and rendered a decision in favor of plaintiff. Defendants appeal from the judgment entered in accordance with this decision.

There is but one question in the case, and that is whether the evidence sustains the finding that defendants agreed in writing to accept and pay the draft in question.

The evidence is not much in conflict, and is sufficient to warrant a finding of the following facts:

Defendants had their principal place of business at South St. Paul and were in the business of selling live stock on commission. Roedel lived at Jamestown, North Dakota. He had known one of the defendants for many years. In the spring and summer of 1912, Roedel had little or no money. He came to defendants' place of business in South St. Paul to arrange with them for money with which he might buy cattle in the vicinity of Jamestown, to be shipped to defendants and sold on commission. He did not find either of defendants in the office, but talked over his plans with the person in charge, and returned to Jamestown. On June 4, he wrote defendants a letter saying: "Please write to the James River National Bank, Jamestown, N. D., that you will honor my drafts for car cattle or hogs with B of L attached and invoice of live stock. You will please do this on receipt of this letter for I am now ready to go and buy all the cattle I can get during all summer." On receipt of this letter, and on June 5, defendants telegraphed plaintiff as follows: "We will honor draft of G. Roedel, bill of lading attached for stock purchased by him shipped Thuet Brothers." On June 6, defendants wrote to Roedel as follows: "Instead of waiting to write to your bank we wired them, thinking that perhaps you might be waiting for us to get word to the bank and that a wire would get through quicker." The letter also contained instructions to be careful in buying cattle that are on grass, and not to purchase rough and heavy hogs. On receipt of this letter Roedel presented it to the cashier of plaintiff and inquired whether the bank had received a telegram from defendants. The cashier said that the telegram had been received, took the letter and filed it with the telegram, informing Roedel that it would be necessary in the case of each shipment to

consign it to defendants, send plaintiff the bill of lading with a statement of the amount he was paying for the cattle, and a draft on defendants for the amount. The cashier gave Roedel a book of checks on the bank, and told him that it would pay checks that he drew in payment for cattle purchased. Roedel then went into the surrounding country to contract with the farmers for the purchase of stock and arrange to have it delivered at a railroad station where it could be loaded for shipment. When so delivered, he drew his checks on plaintiff bank for the amounts necessary to pay for the stock, and delivered them to the respective farmers from whom the stock was purchased. These checks were presented to plaintiff and paid. The stock was then loaded on the cars. Each shipment was consigned to defendants, and Roedel drew a draft for the amount he had paid, attached thereto the bill of lading and sent it to plaintiff. The first shipment was made June 13, 1912, and the draft with bill of lading attached was sent to South St. Paul, presented to and paid by defendants. During June, July, August and September Roedel made seven shipments of stock to defendants, and in each case, except the last, defendants paid the draft drawn on them by Roedel. The last shipment was made September 21, 1912, and a draft drawn and presented as usual for the amount paid by Roedel to purchase the stock. Roedel accompanied this shipment to South St. Paul. When it arrived the market was poor, and the shipment, with Roedel accompanying it, went on to Chicago in an effort to get better prices. When the draft was presented defendants refused to pay it, and it has not been paid, except that plaintiff received part of the amount from the proceeds of the sale of the cattle in Chicago, leaving a balance of $1,475.89 unpaid.

If defendants accepted the draft in writing they are liable in this action. If they did not, there is no liability. The acceptance claimed is the telegram of June 5 sent by defendants to plaintiff. The claim of plaintiff is that this constituted an acceptance of and agreement to pay all drafts which should be drawn on defendants by Roedel with bill of lading attached to pay for stock purchased by him during the season and shipped to defendants. The contention of defendants is that this telegram, using, as it did, the word "draft" instead of "drafts," constituted an acceptance of but one draft, the first that should be drawn. If plaintiff's

contention is correct, there is no doubt that the telegram constituted a valid acceptance of all the drafts. Union Bank of Medina v. Shea, 57 Minn. 180, 58 N. W. 985.

Defendants insist that the telegram is clear and unambiguous, and therefore that the surrounding circumstances, the situation and conduct of the parties before or after the telegram was sent, cannot be used as aids in construing its meaning. Plaintiff is equally insistent that the telegram is open to explanation and construction, and that the evidence clearly shows that its meaning was as claimed. We agree with the view of plaintiff. If the telegram of June 5 is read by itself, without reference to the subject matter and surrounding circumstances, it perhaps would have to be construed as a promise to honor one draft only, but its meaning is not so clear that it is improper to consider the situation of the parties, their prior and subsequent conduct in construing the telegram, the subject matter and surrounding circumstances, in showing that there was an ambiguity, and in clearing up that ambiguity. The telegram does not refer to a particular draft, mention a particular amount, or say that but one car is to be shipped, or but one shipment made. There is sufficient uncertainty in the telegram itself as to what defendants intended, to justify the use of such evidence to explain its meaning, and to show that what was intended by the language used was a promise to honor all drafts, with bills of lading attached, that Roedel might draw against defendants for stock purchased by him and shipped to them during that season. There are many cases in our reports where extrinsic evidence of the surrounding circumstances has been used to show that writings as plain on their face as this telegram are really ambiguous, and to explain their true meaning. Union Bank of Medina v. Shea, supra, was such a case. It is often necessary, in order to arrive at the true construction of an instrument, to resort to extrinsic evidence, though the instrument is apparently plain on its face. And this has often been done, notwithstanding the expressions in some of the decided cases that no extrinsic evidence is admissible unless ambiguity appears upon the face of the instrument. See 1 Dunnell, Minn. Dig. §§ 3400-3407, and cases cited.

By resorting to the evidence showing the situation and relation of the parties, the circumstances surrounding the sending of the telegram, and the conduct of the parties in acting upon it, it is made entirely clear to our

minds that defendants intended by the telegram to agree to honor all drafts drawn by Roedel during that season for stock purchased and shipped to defendants. The letter of Roedel which induced the telegram to the bank asked defendants to write the bank that they would honor his "drafts" and he states that he is "ready to go and buy all the cattle I can get during all summer." The letter of defendants in reply to this plainly indicates a compliance with Roedel's request, but by wire instead of by letter, and the understanding of defendants that Roedel was to make a series of shipments during the summer. Defendants were in the business, and naturally desired to earn commissions on as many sales as Roedel could give them. Roedel, to their knowledge, had no money to buy stock. It was to defendants' interest to make the arrangement he suggested. When we come to the practical construction of the agreement made by the telegram, there is no doubt that all parties acted upon the promise as if it were to pay all drafts. Plaintiff bank and Roedel clearly understood it that way, and the bank paid out large sums in reliance upon such understanding, and it is no less clear that defendants' understanding was the same. They paid without question six drafts drawn during a period of three months and more. Defendants point out that as to two of these drafts the bank wired them for their acceptance and received it, and that a third draft was made payable "demand on arrival of car." This is true, as it is that the other drafts were not actually paid until the stock arrived. The last fact is not of much consequence as indicating how the parties construed the telegram of June 5, and the telegrams of the bank asking for defendants' acceptance of the two drafts are sufficiently explained by the evidence.

It is difficult, if not impossible, to distinguish the present case from Union Bank of Medina v. Shea, supra. Our conclusion is that the findings are sustained by the evidence and warrant the judgment rendered.